IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEITH PERRY, | ) |
|     Plaintiff, | ) ) ) |
|     v. | ) No. 15-cv-06893 ) ) Judge Andrea R. Wood |
| STATE OF ILLINOIS DEPARTMENT OF HUMAN SERVICES, | ) ) ) ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith Perry is a man over the age of forty formerly employed by the Illinois Department of Human Services ("DHS"). Perry claims that during his time at DHS, he endured discrimination based on his age and sex and was retaliated against for asserting his rights. Consequently, Perry brought this lawsuit against DHS pursuant to Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 *et seq.* Before the Court is DHS's motion for summary judgment. (Dkt. No. 37.) For the reasons discussed below, the motion is granted.

## BACKGROUND

The Southeast Family Community Center is a local office of DHS that works with customers, providers, and advocates regarding the provision of SNAP (food stamps), WIC (food assistance), cash assistance, medical care, and other programs. (Pl.'s Resp. to Def.'s Stmt. of Facts ("PRDSF") ¶ 8, Dkt. No. 43.) On November 2, 1998, Keith Perry started working at the Southeast Family Community Resource Center as a Human Services Caseworker. (*Id.* ¶¶ 4, 6.) Perry's job responsibilities included ensuring adherence to policies related to the provision of food stamps, medical assistance, and other programs. (*Id.* ¶ 9.) During the relevant timeframe,

L.K. McIntosh was the Local Administrator at the Southeast Family Community Resource Center. (*Id.* ¶ 11.) Directly below McIntosh in the chain of command were two Assistant Local Office Administrators who oversaw approximately nine Casework Managers, including Perry. (*Id.* ¶ 12.)

From April 2012 to June 2013, Perry was repeatedly reprimanded and suspended due to several workplace incidents. This record of misconduct appears to begin on April 27, 2012, when Perry was accused of making rude, discourteous, and threatening statements to an Assistant Local Office Administrator, Dalphine Pearson. (*Id.* ¶¶ 14, 21.) Perry denied making the statements but ultimately received a written reprimand for his behavior. (*Id.*) The decision to reprimand Perry was based on six witness statements. (*Id.* ¶ 21.)

The next recorded incident occurred on August 10, 2012, when Lois Gillespie, the Intake Manager, placed a file on Perry's desk while he was servicing another customer. (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ("DRPSAF") ¶ 5, Dkt. No. 44; PRDSF ¶ 27–29.) What followed is largely disputed, but the record indicates that Perry brought the file back to Gillespie and tried to place it in her arms. The file dropped to the floor and Perry refused to retrieve it for over an hour despite repeated directions from Gillespie to pick up the file. (PRDSF ¶¶ 27, 28.) As a result, Perry received a one-day suspension for failing to follow supervisory instructions. (*Id.* ¶ 26.)

On October 12, 2012, Perry found himself in conflict with Gillespie again, although exactly what happened is again largely disputed. According to DHS, McIntosh was sitting at the first-floor security desk when he heard Perry loudly telling Gillespie that he was not going to provide service to a customer assigned to him by Gillespie. (*Id.* ¶ 31.) McIntosh intervened and instructed Perry to follow Gillespie's instructions. (*Id.* ¶ 32.) The conflict escalated to the point where Perry had to be pulled away from McIntosh by other coworkers. (*Id.* ¶ 34.) Perry contends

that he was not speaking loudly and was actually servicing another customer when Gillespie made her request. (*Id.* ¶ 31.) Perry claims that McIntosh said he "was going to kick [Perry's] ass" and "fuck [him] up." According to Perry, McIntosh also told Perry to "[s]top acting like a little ass girl and do what Gillespie told you to do." (DRPSAF ¶ 11.) Ken McCaffrey, the Bureau Chief of the Workplace Violence/Internal Investigations Bureau for DHS, reviewed the incident and determined that Perry had threatened McIntosh, had to be physically held back by coworkers, and was in violation of the Workplace Violence Policy of DHS. (PRDSF ¶ 37.) As a result of this finding, Perry was given a 29-day suspension. (*Id.* ¶ 38.)

On December 12, 2012, Perry was reassigned to field staff. (*Id.* ¶ 41.) DHS contends that Perry was reassigned due to personality conflicts with his new supervisor, Charlotte Griffin, but Perry claims he was reassigned in retaliation for performing union duties. (*Id.* ¶ 41.) During his time under Griffin, he had numerous arguments with her, and according to DHS, he was unwilling to accept Griffin's supervisory instructions. (*Id.* ¶ 42.)

Although Perry was removed from Griffin's supervision, his disputes with her continued during the subsequent months. On June 7, 2013, Griffin reported that Perry had verbally threatened her two days earlier during a dispute about leaving work early. (*Id.* ¶ 45.) Apparently, the incident escalated to the point where Perry was escorted back to his desk—although he denies that this escort was necessary. (*Id.* ¶ 46.) The incident resulted in a 45-day disciplinary suspension for Perry. (*Id.* ¶ 48.)

During his 45-day suspension, Perry applied for SNAP food stamps. (*Id.* ¶ 51.) Perry returned to work on October 15, 2013. (*Id.* ¶ 60.) At some point, the Southeast Family Community Center was contacted by the DHS Roseland Office because Perry had an active case at the Roseland office seeking food stamp benefits. (*Id.* ¶ 51.) Perry's card was still being used

up until February 18, 2014—four months after his return to work. (*Id.* ¶ 58.) According to Perry, he lost his SNAP benefits card before he returned to work. (*Id.* ¶ 57.) Perry states that he sent a letter to the Roseland office in an attempt to cancel his benefits and also attempted to call the office. (PSAF ¶ 27.) Perry claims that after he was contacted by DHS about fraud he paid back the SNAP benefits used during the periods when he was ineligible. (*Id.* ¶ 59.)

On April 7, 2014, Perry was placed on Suspension Pending Discharge. (*Id.* ¶ 60.) DHS claims that the suspension was a consequence of Perry receiving SNAP benefits for which he was ineligible after returning to full-time employment. (*Id.* ¶ 60.) Perry was discharged effective May 7, 2014. (*Id.* ¶ 62.)

Perry now claims that he suffered discrimination because of his age (Counts I and V) and sex (Counts II and VI) while at DHS—as he suffered hardships, was made fun of and cursed at, had derogatory statements made towards him, was unfairly disciplined, and was falsely accused of actions he did not commit. (*Id.* ¶ 66.) With respect to the age discrimination allegation, Perry testified that McIntosh once told him that DHS was getting rid of old-timers because those employees could easily be replaced with young kids out of college. (*Id.* ¶ 68.) Perry also claims that he was retaliated against for filing Charges of Discrimination with the Illinois Department of Human Rights ("IDHR") (Counts III, IV, and VII). Indeed, between January 3, 2013 and April 9, 2014, Perry filed four Charges of Discrimination with the IDHR, which were cross-filed with the Equal Employment Opportunity Commission. (*Id.* ¶¶ 70–74.)

## DISCUSSION

When considering a summary judgment motion, the Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). But "favor toward the

4

nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (internal citation and quotation marks omitted). The "mere existence of *some* alleged factual dispute" does not suffice to defeat a motion for summary judgment. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal citation and quotation marks omitted) (emphasis in original). Rather summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the applicable substantive law." *Lawrence v. Kenosha Cty.,* 391 F.3d 837, 842 (7th Cir. 2004) (internal citation and quotation marks omitted). A dispute is sufficiently genuine to defeat a motion for summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal citation and quotation marks omitted).

## I. Age and Sex Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA prohibits an employer from discriminating against an individual on the basis of his or her age. *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999); *see also* 29 U.S.C. § 623(a) ("It is unlawful for an employer . . . to discharge any individual . . . because of such individual's age.")

To establish a *prima facie* case of sex or age discrimination, the plaintiff must present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 762 (7th Cir. 2016). Thus, in Perry's case, the "sole question that matters" is whether a reasonable juror could conclude that Perry would have kept his job if he had a different age or sex, and everything else had remained the same. *Id.* at 764. In assessing this question, the Court may use the "burden-shifting framework" announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 766. But *McDonnell Douglas* is not the only way to assess evidence of discrimination. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination"). As explained in *Ortiz*, Court may also simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 846 F.3d at 224.

    A.    *McDonnell Douglas* Test

"Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case of sex or age discrimination if [he] demonstrates, by a preponderance of the evidence, that: (1) [he] is a member of a protected class; (2) at the time of termination, [he] was meeting [his] employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of [his] employer, [he] suffered an adverse employment action; and (4) [he] was treated less favorably than similarly[-]situated [female] or younger employees." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If Perry establishes a *prima facie* case of sex or age discrimination, DHS must then produce a legitimate, nondiscriminatory reason for the employee's termination. *Id.* If the Defendant meets this burden, then Perry must present evidence that the employer's proffered explanation is pretextual. *Id.*

6

### 1. The Protected Classes

Here, it is undisputed that Perry was a member of the protected class of employees "at least 40 years of age," 29 U.S.C. § 631(a). But with respect to sex discrimination, as a male, Perry must adduce evidence of "background circumstances" of "something fishy going on" with respect to the treatment of men at DHS to demonstrate that he qualifies as a member of a protected class under Title VII. *See Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) ("When a plaintiff is a member of a majority—for instance, a male plaintiff alleging gender discrimination—we have said he must set out background circumstances that show the employer discriminates against the majority, or he must show there is something fishy going on.") (internal quotation omitted).

As evidence of fishy background circumstances, Perry notes that "female managers were often involved in inflating [his] alleged misdeeds." (Pl.'s Resp. at 3, Dkt. No. 47.) But both McIntosh and McCaffrey, two male employees, were involved in making decisions regarding Perry's reprimand, suspension, and ultimate termination.

Perry also broadly claims that female coworkers Leslie Oliver, Marcea Jones, Constance Williams, Shawnee Washington-Geiger, Gwendolyn Myers, and Charlotte Griffin were treated more favorably than Perry. (DRPSAF ¶ 35.) But he gives no details regarding how and when those female employees were treated "more favorably." The record is silent as to whether those employees had the same supervisor and were subject to the same standards of employment as Perry. Perhaps most importantly, however, Perry has not provided the Court with any evidence that the female employees were accused of similar misconduct as Perry but treated more leniently. *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015). Indeed, in his

7

statement of additional facts, Perry does not even say that these women *were* treated more favorably but instead simply lists them as comparators.

As a result, Perry cannot defeat summary judgment on his Title VII sex discrimination claim by invoking the *McDonnell Douglas* test. The Court thus proceeds with its analysis of the *McDonnell Douglas* factors solely as to Perry's age discrimination claim.

### 2. Employment Expectations

The next issue the Court must consider with respect to Perry's age discrimination claim is whether Perry was meeting DHS's legitimate employment expectations at the time of his termination.[1]

The evidence regarding Perry's employee performance is conflicting. Notably, on June 6, 2012, Perry received a written reprimand for rude and discourteous behavior. (*Id.* ¶ 21.) That decision was based on six witnesses who stated that Perry acted unprofessionally in an interaction with his supervisor. (*Id.*) Perry's conduct in that instance failed to comply with the Rules of Employee Conduct, which state that "[a]n employee shall not demonstrate inappropriate behavior and/or discourteous treatment of the public, co-workers, client, and/or applicants." (PRDSF ¶ 19.) Besides this incident, however, the rest of the record regarding Perry's alleged insubordination and failure to follow procedure is contested.

In addition to disputing most of the evidence that tends to show his failure to meet employee expectations, Perry's overall argument in this case is premised on the notion that he was unfairly disciplined because of age and race. In such a situation, "[e]ven if an employee was not meeting his employer's legitimate expectations, he can still establish a *prima facie* case . . . if

---

[1] Perry argues that his earlier performance reviews establish that he met DHS's legitimate expectations. But Perry must show that he was meeting DHS's expectations at the time of his termination, which would include consideration of the evidence that he did not violate DHS policies. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).

8

the company applied its expectations against him in a discriminatory manner." *Dossiea v. Bd. of Educ. of City of Chicago*, No. 07-cv-1124, 2008 WL 4133418, at *4 (N.D. Ill. 2008) (citing *Peele v. County Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)). For example, "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (*i.e.*, applied expectations to similarly[-]situated . . . younger employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge." *Peele*, 288 F.3d at 329. Thus, Perry's case boils down to two issues: (1) whether Perry was treated less favorably than similarly-situated, younger employees; and (2) whether DHS's reasons for reprimanding, suspending, and ultimately firing Perry were pretextual.

### 3. Less Favorable Treatment

Perry's age discrimination claim fails the *McDonnell Douglas* test because he has not presented any admissible evidence that other, younger DHS employees in his job title were treated more favorably than he was treated. A plaintiff may demonstrate that another employee is similarly situated by showing "that there is someone who is directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). In analyzing whether employees are "similarly situated," the Court asks whether "there are enough common features between the individuals to allow a meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Some factors considered in determining whether two employees are similarly situated include if they "had the same supervisor, [were] subject to the same standards, and engaged in similar conduct. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014); *see also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 467 (7th

Cir. 2014) (observing that the court must ask whether a younger, similarly-situated employee "who [was] not performing up to expectations was also terminated").

Perry claims that similarly-situated younger employees who engaged in the same or worse conduct as he did were not suspended and discharged as a result. But Perry has not pointed to the existence of ***any*** similarly-situated younger employee, let alone one who engaged in similar conduct as Perry without reprimand or termination. Because Perry has failed to provide evidence of similarly-situated younger employees, he has failed to state a claim for age discrimination under the *McDonnell Douglas* test.

### 4. Pretext

Even if Perry had presented a *prima facie* case under *McDonell Douglas*, he would still fail to demonstrate a triable issue of fact as to whether DHS's stated nondiscriminatory reasons for suspending and ultimately terminating him—insubordination and unwarranted use of food stamps—were pretextual.

To show pretext, "the plaintiff must present evidence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Id.*; *see also Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee.") (quoting *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)). To demonstrate pretext, Perry must point to evidence from which a reasonable jury could conclude that the defendant's stated reasons for suspending or terminating him were "phony" or a "lie." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). In claiming that the reasons

offered for his suspensions and termination were mere pretext, Perry simply asserts that he was a model employee, members of the management disliked him, and he did not know that his benefits card was being used while he was ineligible. Perry also questions the credibility of DHS's witnesses.

The Court first turns to Perry's multiple suspensions. Regardless of the alleged credibility of DHS's witnesses (which would be a matter for a jury to evaluate), it is clear from the record that Perry had volatile relationships and experiences with multiple other employees in his office. Indeed, Perry admits to having numerous arguments with one of his supervisors, Griffin. (PRDSF ¶ 42.) Perry also clashed with Gillespie and McIntosh. One of Perry's disputes with Gillespie and McIntosh was referred to the Bureau Chief of Workplace Violence, who determined that Perry threatened McIntosh, had to be physically held back by coworkers, and violated the Workplace Violence Policy. (*Id.* ¶¶ 31–37.) Perry does not allege or show that the Bureau Chief was anything other than an objective observer to his situation. On a different occasion, McIntosh sent a Workplace Violence Incident Report to the Bureau Chief of Workplace Violence stating that Griffin, Perry's supervisor at the time, reported that she was verbally threatened by Perry during a dispute. (*Id.* ¶ 45.) The Bureau Chief determined that the incident was unsubstantiated with respect to any work place violence but nonetheless found that Perry acted in an unprofessional manner. (*Id.* ¶ 47.) Perry does not deny that he confronted Griffin regarding their disagreements but seems to deny he was in the wrong during this incident. (DRPSF ¶¶ 16–22.) Perry's actions resulted in a 45-day suspension. (PRDSF ¶ 48.)

In sum, the undisputed record clearly shows that Perry clashed with numerous other employees, some of those incidents were reviewed by an objective third-party, and Perry was found in the wrong. Besides his own speculation, Perry has failed to identify any "weaknesses,

implausibilities, inconsistencies, or contradictions" regarding those facts. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Based on this evidence, no reasonable fact-finder could find that DHS's stated reasons for suspending and reprimanding Perry were pretextual.

Next, the Court considers DHS's stated reason for firing Perry—the use of his SNAP benefits card long after he was ineligible for food stamps. Perry argues that this reason for terminating his employment was pretextual because he did not know his card was still active. But it is certainly plausible that DHS would expect Perry, whose job is to explain eligibility criteria and requirements for public assistance programs, to strictly adhere to SNAP guidelines. Indeed, because DHS would expect Perry to understand how to close out his SNAP benefits card properly, his failure to do so indicates one of two things: either Perry did not understand benefits compliance (knowledge that is crucial to his position) or he did understand how to close out a SNAP card properly and his continued use of benefits for which he was ineligible was willful. Either way, the failure to close out his SNAP card properly certainly constitutes a credible explanation for Perry's firing. Therefore, in the absence of any evidence to the contrary, there is no basis in the record for the Court to question DHS's stated reasons for suspending and ultimately terminating Perry.

### B. Reviewing the Evidence as a Whole

Of course, a plaintiff need not rely on the burden-shifting framework of *McDonell Douglas* and may instead defeat a motion for summary judgment in a discrimination case by showing that a "reasonable factfinder" could conclude that the plaintiff's protected classification "caused the discharge or other adverse employment actions." *Ortiz*, 834 F.3d at 765. For this analysis, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

Notably, there is barely any mention of Perry's age or sex in the record before the Court. The only time sex is mentioned in the record is during the recounting of an incident when McIntosh allegedly told Perry to stop acting like a little girl. This lone statement is insufficient to demonstrate gender discrimination, however. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781–82 (7th Cir. 2007) ("We have held . . . that stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment."). Moreover, Perry claims that he was discriminated against because he was male and not because he failed to adhere to the male-sex stereotype. Thus, this remark does not support the type of sex-based discrimination Perry alleges.

Additionally, the only evidence Perry produces of age animus by his supervisors is a statement from McIntosh that DHS was "getting rid of old-timers because these employees could be easily replaced with young kids out of college." (PRDSF ¶ 68.) In some circumstances, a single comment or remark can suffice to create an inference of discrimination if it "(1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action." *Mach v. Will Cty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). Here, the isolated remark was made by the decisionmaker, McIntosh, and he at least threatened the challenged employment action. But Perry cannot establish that the comment was made around the time that Perry was terminated because he was unable to recall when the comment was made. *See Crotteau v. St. Coletta of Wisc.*, 200 F. Supp. 3d 804, 813–14 (W.D. Wis. 2016) (finding no inference of discrimination when the plaintiff was unable to explain when the decisionmaker made the isolated remark). Furthermore, the ADEA requires that the plaintiff establish that age "actually motivated the employer's decision" and "had a determinative influence on the outcome." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). Even accounting

for this remark, it would not be sufficient to establish that age was the determinative factor in Perry's termination rather than his disciplinary incidents and failure to properly close out his SNAP benefits card. DHS is therefore entitled to summary judgment on Perry's age and sex discrimination claims.[2]

## II. Retaliation Claim

In addition to his discrimination claims, Perry also accuses DHS of retaliating against him for filing Charges of Discrimination with the IDHR.

Title VII and the ADEA prohibit an employer from retaliating against an employer for asserting his or her right to be from discrimination under those statutes. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 807 (7th Cir. 2014) ("Unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.") (quoting *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012)). Perry may establish retaliation under both Title VII and the ADEA by setting forth "proof that (1) the employee engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal link exists between the two." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013); *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). In addition, as with the discrimination claims, Perry may use the *McDonnell Douglas* framework to show "that (1) the employee engaged in statutorily protected activity; (2) [he] was meeting [his] employer's legitimate expectations; (3) [he] suffered an adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Majors*, 714 F.3d at 537. The parties do not

---

[2] The Court reaches this conclusion even considering paragraphs 18–19, 29–32, and 38 of Plaintiff's Local Rule 56.1 Statement of Additional Facts, which DHS argues should be disregarded as based on inadmissible hearsay. (*See* Reply at 3, Dkt. No. 53.) Those facts mainly recount certain contentious interactions that Perry had with his coworkers. However, they are largely immaterial and none connect his interpersonal conflicts with unlawful discrimination based on age or sex.

14

dispute that Perry engaged in a protected activity when he filed a charge of discrimination with the IDHR. Therefore, his retaliation claim centers on whether he suffered adverse employment actions as a result of his IDHR filings and discrimination claims.

Perry first contends that the many disciplinary actions imposed on him by DHS are clearly connected to his filings with the IDHR because there is simply no other reason for his suspensions and ultimate termination. According to Perry, his history of good behavior and positive performance reviews proves that he was suspended and ultimately terminated for malicious reasons. Perry also notes that his 45-day suspension was disproportionate for the vague offense of "conduct unbecoming a state employee," implying that the reasoning was fabricated to cover up the fact that management was punishing Perry for filing claims with IDHR. But to establish a causal link, Perry must show that his filings were a "substantial or motivating factor" in the adverse employment actions. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). While the Court draws all reasonable inferences in Perry's favor, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packaging Int'l Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008)). Construing the evidence in Perry's favor, he has not presented sufficient evidence for a reasonable jury to be able to infer that he was retaliated against for voicing concerns about discriminatory work practices.

Alternatively, Perry argues that DHS retaliated against him by creating and tolerating a hostile work environment after he filed discrimination charges with the IDHR. "The creation of a hostile work environment can be a form of retaliation." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 n.5 (7th Cir. 2004). But "[t]he work environment cannot be described as 'hostile' for purposes of

Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). Perry undoubtedly subjectively believed that his work environment was offensive, as evidenced by the number of IDHR charges he filed. Thus, the Court will focus its attention on whether Perry's work environment was objectively offensive.

"In evaluating the objective offensiveness of a plaintiff's work environment, we consider all of the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance." *Racicot v. Wal Mart Stores, Inc.*, 414 F.3d 675, 677–78 (7th Cir. 2005); *see also Clemmer v. Office of Chief Judge of Circuit Court of Cook Cty. & State of Illinois*, No. 06-cv-3361, 2008 WL 5100859, at *14 (N.D. Ill. Dec. 2, 2008) ("[T]he elements of a hostile-environment retaliation action are the same as any other retaliation claim . . . ."). Ultimately, the conduct must be so severe or pervasive as to alter the conditions of employment. *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) are not sufficient to demonstrate a change in the conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility' code." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Perry primarily points to Griffin's conduct as evidence of a hostile work environment. Perry contends that after he and Griffin were separated due to their conflicts, she continued to visit his workspace so she could watch him and take notes on when he left work. Additionally, Perry claims that Griffin falsely accused Perry of leaving work early, threatening her, and using profanity. Even if these claims were sufficient to show an objectively hostile work environment,

Perry has failed to produce evidence that Griffin was aware of Perry's discrimination complaints at the time of her allegedly retaliatory actions and targeted him because of those complaints.

Perry contends that Griffin knew about his January 3, 2013 IDHR Charge of Discrimination because she was named in the complaint, the investigator attempted to contact her twice, and Perry mentioned the complaint to Griffin. It is unclear, however, how Griffin would know about the charge simply because she was named in the complaint—for instance, Perry has not produced evidence demonstrating that individuals named in the complaint were subsequently contacted. As for Perry's allegation that an investigator contacted Griffin about the complaint, the cited portion of the record does not support this claim. Indeed, Perry even cites to an "Exhibit V" that is not included in his filing. The only evidence Perry produces to show Griffin's knowledge is his own testimony asserting that he told Griffin about the IDHR filing before she was his supervisor. Even accepting Perry's claim, this fails to show that Griffin was acting out against Perry **because** of the IDHR filings and not simply because she did not like him.

To establish such a link, Perry points to the closeness in time between his IDHR filings and the alleged retaliatory actions of Griffin and the other supervisors. "Closeness in time between the protected activity and the adverse employment action is evidence of the causal link between the two events." *Majors v. General Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013). But "to survive summary judgment, the plaintiff must offer more evidence that supports the inference of a causal link between the two events than simply close temporal proximity." *Id.; see also Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2004) ("suspicious timing, standing alone," does not establish a causal connection). Perry presents no evidence of a causal link between his complaints and his suspensions and ultimate termination. Instead, Perry urges the

17

Court to infer such a link based on the totality of facts presented. At best, Perry contends that there was no reason for Griffin to harass him, and no reason for DHS to suspend and ultimately fire him, other than to retaliate against him for filing complaints. But, as evidenced by his confrontations with supervisors and his unwarranted collection of food stamps, DHS clearly did have alternative reasons for reprimanding, suspending, and ultimately terminating Perry.

## CONCLUSION

For the reasons discussed above, DHS's motion for summary judgment (Dkt. No. 37) is granted.

ENTERED:

Dated: November 5, 2018

_____
Andrea R. Wood
United States District Judge